REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 413

September Term, 2015

DOUGLAS FORD BEY II

v.

STATE OF MARYLAND

Graeff,
Friedman,
Harrell, Glenn T., Jr.
        (Retired, Specially Assigned),
                JJ.

Opinion by Harrell, J.
Concurring Opinion by Friedman, J.

Filed: June 29, 2016

Appellant, Douglas Ford Bey, II, stood before the Circuit Court for Frederick County accused of sexual abuse of a minor. He was convicted, after a jury trial, on seventeen various counts, resulting in a cumulative sentence of 390 years in prison. Bey argues in this appeal that he is entitled to a new trial because of procedural errors, including the implicit denial of an alleged request to discharge his counsel and the admission of certain demonstrative evidence and testimony regarding DNA, and, in any event, his sentence was improper in significant regard. We disagree with Bey on the first two contentions, but agree that his sentence was improper. Therefore, he shall not receive a new trial, but rather is entitled to a new sentencing proceeding.

## FACTS AND LEGAL PROCEEDINGS[1]

The female victim, a minor at the time of the sexual abuse and at trial, testified that the abuse, all of which occurred in the family home, began in 2010 and continued until about February 2014. She recalled that the first instance of abuse was in the summer of 2010 (when she was ten years old) when Bey, the victim's putative father, performed cunnilingus on her. After this initial incident, the sex acts[2] continued multiple times a week during the ensuing four year span.

---

[1] Because the State accepts generally the Statement of Facts provided in Bey's brief, our recitation of the facts is based on that brief and the transcripts from Bey's September 2014 trial.

[2] The array of sex acts included that Bey "would perform oral sex on her, masturbate while he made her touch herself, force [her] to perform oral sex on him, show her pornography and force her to have vaginal intercourse."

In 2013, the victim, believing she was pregnant, told some friends that she had been molested. Following revelation to Bey of her pregnancy concern, he took her to a doctor, who confirmed the pregnancy. Ultimately, she had the fetus aborted at the University of Maryland Medical Center. Donna Young, a nurse from the hospital, testified that the abortion was performed on 3 February 2014, when the victim was 14 years old.

After this procedure, the victim saw a therapist on 12 February 2014, whom she told about the abuse. The therapist reported the abuse to appropriate governmental and law enforcement authorities. An investigation ensued by the Frederick County Department of Social Services and the Frederick County Sheriff's Office. Detective Ronald Dement, a member of the Sheriff's Office, and Shannon Pulsipher, an investigator for Social Services, were responsible principally for the investigation by their respective agencies.

The victim was brought to the Sheriff's offices to make a statement regarding the abuse. After recording her statement, including a representation that Bey forced her to perform oral sex on him earlier that very day, Detective Dement obtained promptly a search warrant to conduct a forensic sexual assault exam on Bey. Oral and genital swabs were taken from both Bey and the victim. Julie Kempton, a forensic scientist, concluded from testing of the swabs that, to a reasonable degree of scientific certainty, the victim's DNA was present on Bey's penis, according to her testimony at trial.

Also analyzed for DNA evidence was the eleven week old aborted fetus. The fetal tissue was obtained by Detective Dement from Melissa Sheriff, a pathologist assistant for

2

the pathology lab at the University of Maryland Medical Center, and delivered subsequently by him to the Sheriff's Office's property department. Sarah Shields, a DNA analyst, testified that, after conducting genetic tests, she was able to conclude, to a reasonable degree of scientific certainty, that Bey was the biological father of the fetus.

The State introduced also a recorded jail telephone call in which an inmate, referring to himself as "Speedy,"[3] admitted to having his daughter perform oral sex on him. During this same phone call, the inmate requested the other party to the call to cause his backpack to be brought to him. When the law enforcement authorities intercepted Bey's backpack, additional evidence was uncovered from a cell phone found within. Detective Gene Alston testified that the cell phone contained data showing Bey's web history, which included visits to "about 65 pornography web sites, more than a thousand times," between May 2013 and March 2014. Finally, Detective Dement testified that Bey asked him to tell the victim that he "was sorry for everything that he had done."

A jury convicted Bey of seventeen of eighteen charged counts: five counts of sexual abuse of a minor, ten counts of a continuing course of conduct against a child, and two counts of third degree sexual offense.[4] The court sentenced Bey cumulatively to 390

---

[3] Evidence was also presented to show that Bey was known by the nickname "Speedy."

[4] Bey was found only not guilty of one charge: Count 18, for Third Degree Sexual Offense occurring between 21 December 2013 and 12 February 2014.

years in prison.  Bey filed a self-represented Motion for a New Trial, received by the circuit court on 16 September 2014, asserting ineffective assistance of counsel.  The Public Defender's office, which represented Bey at trial, appealed to this Court on 4 May 2015.  Additional facts will be provided as necessary to our analysis of Bey's appellate questions.

## QUESTIONS PRESENTED[5]

Appellant presents three questions for our consideration, which we rephrase here:

1. Did the circuit court err in not granting Bey's request, made during trial, to discharge his counsel?

2. Was a proper chain of custody established to allow the circuit court to admit properly the fetal tissue DNA evidence against Bey?

3. Was Bey sentenced properly on multiple counts of continuing course of conduct with a child?

For the following reasons, we hold that the circuit court did not err with regard to the questions directed to the conduct of Bey's trial, but hold that its sentencing of Bey, as challenged in his third question, was in error.  Thus, we affirm the judgments of conviction, but vacate the sentence and remand for a new sentencing proceeding.

## DISCUSSION

---

[5] Appellant's original questions were:

1. Did the lower court err in failing to recognize and grant Mr. Bey's request to discharge counsel?
2.  Did the lower court err in admitting DNA evidence without a proper chain of custody?
3. Does the evidence support only one conviction for continuing course of conduct against a child?

4

## I. Request to Discharge Counsel

### a. Contentions

Bey contends that the circuit court erred in not granting his implicit trial request to discharge counsel when he stated that he and his attorney had a fundamental disagreement about the scope of cross-examination of the victim and that Bey believed his attorney was "winging it" generally during the trial to that point. The State responds that "Bey did not make any statement from which the trial court reasonably could have concluded that he wanted to discharge his counsel." Moreover, because the alleged disagreement was over a matter of trial strategy, there was insufficient meritorious basis given by Bey for his complaint to be worthy of relief. Additionally, the State maintains that, due to the timing of any perceived discharge request, it was within the circuit court's soundly exercised discretion to deny such during trial.

### b. Analysis

How trial judges are obliged to address a defendant's request to discharge counsel made before trial commences is regulated by Maryland Rule 4-215(e). The Rule explains what mandatory action is to be taken by the circuit court when such a request is made and how appellate review is to be conducted. *State v. Hardy*, 415 Md. 612, 621, 4 A.3d 908, 913 (2010) (citing *Williams v. State*, 321 Md. 266, 272, 582 A.2d 803, 806 (1990)). When the request for discharge is made after voir dire and during the trial, however, this rule does not apply and we are asked instead to "evaluate the trial court's ruling on a motion to discharge counsel under the far more lenient abuse of discretion standard." *Hardy*, 415 Md. at 621, 4 A.3d at 913 (citing *State v. Brown*, 342 Md. 404, 429, 676 A.2d

513, 525 (1996)). Thus, we afford deference to the circuit court's judgment and will "find an abuse of discretion only when the court's act is so untenable as to place it beyond the fringe of what the [appellate] court deems minimally acceptable." *Hardy*, 415 Md. at 621-22, 4 A.3d at 913 (citation and internal quotation marks omitted).

To constitute a request to discharge counsel, "'any statement by the defendant from which the court could reasonably conclude that the defendant desire[s to discharge his counsel is] sufficient' for the court to consider that statement as a request to discharge counsel." *Hardy*, 415 Md. at 622, 4 A.3d at 914 (quoting *Snead v. State,* 286 Md. 122, 127, 406 A.2d 98, 101 (1979)). Such a request will be sufficient "even when [the defendant's] statement constitutes more a declaration of dissatisfaction with counsel than an explicit request to discharge." *Hardy*, 415 Md. at 623, 4 A.3d at 914.

In *Hardy*, the Court of Appeals concluded that a defendant's "declaration that he was 'thinking about changing the attorney or something' reasonably should have led a trial judge to conclude that Hardy wanted, or at the very least was inclined, to discharge his counsel." *Hardy*, 415 Md. at 623, 4 A.3d at 914. Even though Hardy's statement was conclusory, Maryland law required the "court to consider his statement a request to discharge counsel and address the matter accordingly." *Hardy*, 415 Md. at 623, 4 A.3d at 914. Thus, the statement made by a defendant does not need to be an "explicit request to discharge" in order to be understood as a request to do so.

The timing of a request, however, is rather important in the appellate analysis of the circuit court's eventual decision as to whether the request should be granted. In *Hardy*, it was made clear that the timing of the request determined whether "the trial

6

judge's consideration of that request is governed purely by its discretion, or whether it should be circumscribed by the procedural demands of Rule 4-215(e)." *Hardy,* 415 Md. at 624, 4 A.3d at 915. The Court of Appeals concluded in *Hardy* that Rule 4-215(e) "does not apply literally once voir dire begins, and, therefore, the trial judge was not obliged necessarily to adhere to the Rule's strict procedural requirements in considering [the defendant's] request." *Hardy*, 415 Md. at 624, 4 A.3d at 915. To prevent confusion on the part of a jury as to why a defense lawyer was first "in" the case and then "out," and to reduce the potential for a mistrial, "the right to substitute counsel and the right to self-representation are, of necessity, curtailed once trial begins." *Brown*, 342 Md. at 426, 676 A.2d at 524.

Assuming for the sake of argument Bey's comments could be understood as a request to discharge counsel, they occurred well into the trial proceedings. His comments about disagreeing with his attorney as to questions to put to the victim during cross-examination came between conclusion of the direct examination and before potential cross-examination of her. At this point, disposition of any request to discharge counsel would be within the circuit court's sound exercise of its discretion. The established rule in Maryland is "[g]enerally, the longer the defendant waits to request discharge of counsel, the stronger the rationale must be to warrant counsel's dismissal." *Brown*, 342 Md. at 429, 676 A.2d at 525. The Court of Appeals in *Brown* provided a non-exhaustive list of factors to be used by a circuit court judge in determining whether discharge is warranted in the course of a trial:

Therefore, in future proceedings, we suggest that the trial judge consider the following factors in deciding whether to permit discharge of counsel during trial: (1) the merit of the reason for discharge; (2) the quality of counsel's representation prior to the request; (3) the disruptive effect, if any, that discharge would have on the proceedings; (4) the timing of the request; (5) the complexity and stage of the proceedings; and (6) any prior requests by the defendant to discharge counsel.

*Brown*, 342 Md. at 428, 676 A.2d at 525.

In reviewing the circuit court's handling of the assumed implied request by Bey, we shall not hold that the circuit court abused its discretion. Bey's counsel brought his client's concern to the attention of the circuit court and explained why he was choosing not to cross-examine the victim. He believed principally that to do as his client wished might destroy any possible sympathy for Bey (by risking being perceived as "attacking" anew the young victim) and that it was his strategy to focus on challenges to the DNA evidence linking Bey to the asserted sexual misconduct:

> COUNSEL: Your Honor, pursuant to our discussion Mr. Bey and I are having a fundamental disagreement on how the strategy of the case should proceed, particularly at this point of the, ah, trial about the cross examination of the witness that is still on the stand. . . Practically speaking, um . . . it is my opinion that cross examining [the victim] could have a detrimental effect.

Bey's trial counsel explained that he had two main reasons for electing not to cross-examine the young victim:

> [T]wo main reasons, one would be that it would give the State quite frankly an opportunity to perhaps clean up some of the testimony that [ ] I believe as we sit here was not fully elicited for some of the charges. Furthermore, there is going to be a recording of Mr. Bey from one of the jailhouse calls where he [ ] stated that he is going to break the witness down, meaning [the victim]. To the extent that there is a strain of sympathy or hope as we can relate our defense to the jury in this case, um [. . .] doing exactly what Mr.

8

Bey had alluded to or said in the tape I think would do more harm than good in cross-examining [the victim].

On the record, the circuit court listened to Bey's explanation for his objection to the decision made by his attorney not to cross-examine the victim:

THE DEFENDANT: He said character or, or reputation and that's what he said and that's not what my intention was. It was specifically regarding the, um, Ju—June 2010 incident as well as the, ah, area space that was in the upstairs floor where she said this incident happened at[sic], far as the space-wise. It was also, um, far as who was in the household, far as if [the victim] needed assistance or anything of that nature, um, did I prevent [the victim] by any way from, ah, making commotion, kicking, screaming, yelling or saying she needed assistance or did I refuse in any way by stopping her.

. . .

[A]ll my questions is solely regarding the evidence that they had gaven (sic) me. Nothing out of the way and I actually would like you to even take a look at the questions to find out if they are disrespectful, inappropriate, or by any nature like, um, you know, would not, would, would, would be irrelevant. That, that I would, I would actually ask you to look over that because I feel as though just because [the victim] did not state a specific date that still does not, ah, ah, ah, um without a reasonable doubt or say that the ah, what the State is trying to prove course of conduct and the time period that she's trying to say that all this has happened. So due to the fact that, you know, the, the, the, the State got to prove their case and I feel as though the questions that regarding strictly to what they gave me is irr – is irrelevant. But [the victim], I understand he, he, ah, the testimony that the State gave regarding [the victim]. So I would like you to look it over to see if they are disrespectful, trying to, ah, um, a, a dis, destroy her any way.

The court heard further from Bey:

THE COURT: All right. Have you reviewed those questions with [your counsel]?
THE DEFENDANT: Actually yes I did and none of those questions - -
THE COURT: Well, and [he is] your attorney
THE DEFENDANT: He's been winging it, sir, the whole time.
. . .
THE DEFENDANT: So at any time is it possible that, ah, I, ah, I asked [my counsel] to ask these questions is that he should ask these questions.
THE COURT: It's - -

9

THE DEFENDANT: Because if he's here to work for me, Your Honor, I mean, and if I got good concerns and it's not inappropriate.
THE COURT: Some issues are for you to decide such as whether you plead guilty or not guilty, whether you have a jury, court trial, whether you testify or not and other matters. Trial strategy and tactics are [your counsel's].

It is clear from the record that Bey was given a reasonable opportunity to air his grievances regarding his attorney and that he did not request explicitly for his counsel to be replaced. Even assuming, as we do, that Bey's comments could be understood as a request to discharge counsel, the timing of Bey's comments placed the decision within the sound discretion of the circuit court of what, if any, action to take. The circuit court believed that Bey's concerns went only to his attorney's trial strategy (which strategy appears to have a rational basis for not cross-examining the victim, especially in light of the State's other evidence inculpating Bey, with questions that could be perceived by the jury as attacking her credibility as to whether the sexual abuse occurred wholly or in part as she testified on direct examination). Bey's tag-along generic and unsubstantiated description of his counsel as "winging it" generally is, without more, not a rational basis to discharge counsel in mid-trial, especially when counsel indicated he intended to focus ultimately on the scientific evidence linking Bey to the alleged misconduct. We cannot conclude on the record before us that the circuit court abused its discretion in not granting an implied request to discharge counsel for the reasons offered by Bey.[6]

---

[6] A recent case decided by the Court of Appeals, *State of Maryland v. Jeriko Graves*,___ Md. ___ (2016), (No. 57, September Term 2015) (filed 22 April 2016), discusses a similar issue. That case, however, applies specifically to the application of Maryland Rule 4-215(e). The Court of Appeals remanded that case to the trial court

(Continued…)

## II. Admission of DNA Evidence

### a. Contentions

Bey contends that the State failed to establish a proper chain of custody for the fetal tissue DNA evidence and, therefore, the circuit court erred by admitting this evidence (and related testimony) over his trial counsel's objection. Bey maintains that the lack of recollection by Melissa Sheriff, the pathology assistant, as to the name of the law enforcement officer to whom she gave the tissue sample does not satisfy the State's burden under the Maryland rules. The State responds that it established a chain of custody for the evidence because the container was marked and sealed. Regardless of Sheriff's inability to recall the officer's name to whom she gave the evidence container, the State argues that "there was no reasonable probability that any tampering [with] the tissue occurred."

### b. Analysis

As a general proposition, admission of evidence "ordinarily is left to the sound discretion of the trial court." *Moreland v. State,* 207 Md. App. 563, 568, 53 A.3d 449, 453 (2012) (citing Md. Rule 5-104(a)). On appellate review, we will "not disturb a trial court's evidentiary ruling unless the evidence is plainly inadmissible under a specific rule

---

(…continued)
(affirming of the Court of Special Appeals's judgment) because the circuit court failed to ask the proper questions of the defendant to determine if there was a meritorious reason for dismissal or discharge of his attorney in a pre-trial context. The facts of the case before us are quite different, due to the timing of any "request," as well as the circuit court's on-the-record discussion with Bey about the basis of his disconcert with his counsel. Therefore, *Graves* does not bear directly on our decision here.

11

or principle of law or there is a clear showing of an abuse of discretion." *Moreland*, 207 Md. App. at 568-69, 53 A.3d at 453(internal quotation marks omitted) (citing *Decker v. State,* 408 Md. 631, 649, 971 A.2d 268, 279 (2009)).

Maryland Rule 5-901(a) requires that demonstrative evidence be authenticated "as a condition precedent to admissibility[, which] is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." A chain of custody is required for such items of evidence "in order to assure that the particular item is in substantially the same condition as it was when it was seized." *Wagner v. State*, 160 Md. App. 531, 552, 864 A.2d 1037, 1049 (2005) (citing *Lester v. State,* 82 Md. App. 391, 394, 571 A.2d 897, 899 (1990)). The party offering the evidence is required to "account for its handling from the time it was seized until it is offered in evidence." *Wagner*, 160 Md. App. at 552, 864 A.2d at 1049 (citing *Lester,* 82 Md. App. at 394, 571 A.2d at 899). Establishing this chain of custody allows a court to admit the evidence without concern about tampering: "The circumstances surrounding its safekeeping in that condition in the interim need only be proven as a reasonable probability. . . and in most instances is established. . . by responsible parties who can negate a possibility of 'tampering'. . . and thus preclude a likelihood that the thing's condition was changed." *Wagner*, 160 Md. App. at 552, 864 A.2d at 1049-50 (quoting *Best v. State,* 79 Md. App. 241, 250, 556 A.2d 701, 705 (1989)).

Here, we find that it was within the circuit court's discretion to admit the evidence in question. The State set forth a chain of custody for the fetal tissue DNA evidence, based on the testimony of Detective Dement and Melissa Sheriff. Detective Dement

12

testified that all of the forensic evidence, including the Sexual Assault Forensic Exams ("SAFE") and the fetal tissue were placed in sealed packages, with his initials and an identification number on it. When asked to authenticate the fetal tissue at trial, Detective Dement explained this chain:

> Q: Okay. And from where did you receive it?
> A: Um, from pathology down at the University of Maryland Medical Center.
> Q: On what date did you receive it?
> A: On the 18th of February.
> Q: All right. And from whom did you receive it?
> A: Last name Sheriff. I think it's, is it Melissa? Yeah, Melissa Sheriff.
> . . .
> Q: All right. I'm gonna ask you to look inside basically just to say that does it appear to be what you received from Ms. Sheriff that day?
> A: Correct.
> Q: All right. And when you received it, um, it was, ah, a plastic container with contents in it packaged in a, in a plastic bag.
> A: Correct.
> . . .
> Q: All right. And then when was this evidence tape placed on it and when was it initially sealed?
> A: Um, the same day that I received it, transported from pathology back to the sheriff's office and put it on property.
> Q: Placed on property? All right.
> A: Which is evidence, right –
> Q: Okay
> A: Evidence unit.

After Detective Dement secured the container, it was transported to Bode Technology by Camille Moore, a forensic services analyst employed by the Frederick County Sheriff's Office. When Sarah Shields, a DNA analyst at Bode Technology, received the container, the seal was still intact. It is clear from this testimony that there was no reasonable opportunity for tampering to occur and that the State established properly a chain of custody sufficient to allow for the admission of the fetal tissue DNA evidence.

13

Bey argues that Sheriff's inability to recall the officer's name is sufficient standing alone to disrupt the State's chain of custody. We disagree with this proposition because the State was able to provide testimony which showed that the container was labeled and sealed the entire time it was being transported between the tissue collection point at the University of Maryland Medical Center and the penultimate resting place in the evidence locker at the Frederick County Sheriff's Department. There is no evidence that tampering occurred. A tangential lapse in a witness's memory is not enough to discount the chain of custody established by the State. The circuit court did not abuse its discretion by allowing receipt of this demonstrative evidence and the related testimony to be introduced at trial.

## III. Continuing Course of Conduct with a Minor

### a. Contentions

Applying Maryland Code (2002, 2012 Repl Vol.), Criminal Law Article § 3-315 ("Crim. Law"), Bey contends that the evidence presented by the State only permits a sentence for one conviction for continuing course of conduct against a minor. He maintains that the General Assembly "intended the unit of prosecution under [Crim. Law] § 3-315 to be the course of conduct, not each specific type of sexual act, and not each 90-day period or calendar year for which the course of conduct continued."

14

The State responds that Bey did not preserve this question for our review[7], but that even if he did, his contentions are without merit. The State stands by its approach in essentially indicting Bey in one year increments, distinguished by the specific sexual act committed during each period, and the resultant multiple convictions and sentences. The State asserts that the language of Crim. Law § 3-315 does not prevent the State from charging Bey for multiple continuing courses of conduct during the four year span, based on its interpretation of the plain language of the statute.

### b. Analysis

### 1.

When the circuit court's judgment "involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are legally correct under a [non-deferential] standard of review. " *Nesbit v. Gov't Emps. Ins. Co.*, 382 Md. 65, 72, 854 A.2d 879, 883 (2004). It is our assignment to "ascertain and effectuate the intent of the Legislature." *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park,* 392 Md. 301, 316, 896 A.2d 1036, 1045 (2006). This analysis starts with consideration of the amenability of a plain meaning interpretation, in which we seek to give the language of the statute "its natural

---

[7] We disagree with the State's contention that this question was not preserved for our review. Bey's argument relates to the verdict on the ten counts of continuing course of conduct and his sentences. It does not go to the accuracy or duplicity of his indictment; rather it goes specifically to the convictions that were rendered at trial. The question of an illegal sentence is reviewable by this Court with or without an objection on the record. *See Montgomery v. State*, 206 Md. App. 357, 410, 47 A.3d 1140, 1170-71 (2012).

and ordinary meaning." *Stoddard v. State*, 395 Md. 653, 661, 911 A.2d 1245, 1249 (2006). When construing the statute, the court must "avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense." *Stoddard*, 395 Md. at 663, 911 A.2d at 1250 (citation omitted).

The statute in question here was enacted in response to confusion in the legal community regarding how to charge individuals suspected of a continuing course of conduct with a minor, and not create a duplicitous verdict. The Court of Appeals explained that "the object of all pleading, civil and criminal, is to present a single issue in regard to the same subject-matter, and it would be against this fundamental rule to permit two or more distinct offenses to be joined in the same count." *Cooksey v. State*, 359 Md. 1, 7, 752 A.2d 606, 609 (2000) (citing *State v. Warren,* 77 Md. 121, 121-22, 26 A. 500, 500 (1893)). A pleading under Maryland Rule 2-303(a) requires that each cause of action be set forth separately to reduce "the prospect of uncertainty as to whether the jury unanimously found guilt as to all offenses, at least one but less than all, or none, and, if at least one but less than all, which ones." *Cooksey*, 359 Md. at 9, 752 A.2d at 610.

In respect to the particular issue of repeated child sexual abuse, the Court of Appeals noted:

> All of the courts are sympathetic to the plight of both the young victims, often unable to state except in the most general terms when the acts were committed, and of prosecutors, either hampered by the lack of specific information or, when it is reported that the conduct occurred dozens or hundreds of times over a significant period, faced with the practical problem of how to deal with such a multitude of offenses. The courts are all also properly concerned with the rights of defendants, who go to trial with a presumption of innocence, and with the ramifications to them of duplicitous pleading. Some have struck the balance in favor of easier prosecution by

16

allowing *some* bundling of offenses, especially if committed within a reasonably brief period.

*Cooksey*, 359 Md. at 18-19, 752 A.2d at 615. The Court of Appeals in *Cooksey*, persuaded by the reasoning in *State v. Saluter*, 715 A.2d 1250, 1255 (R.I. 1998), explained that "'reconceptualization of child sexual assault as a continuing course of conduct crime would eliminate duplicity problems in charging these offenses' and recognized that some States had done that, but it concluded that the creation of such a crime was for the legislature, not the court." *Cooksey*, 359 Md. at 19, 752 A.2d at 616.

In apparent response to *Cooksey*, the General Assembly created Crim. Law. § 3-315.[8] This statute, under subsection (a), created a single felony where:

---

[8] Maryland Code (2002, 2012 Repl Vol.), Criminal Law Article § 3-315 ("Crim. Law") provides in its entirety that:

**In general**
(a) A person may not engage in a continuing course of conduct which includes three or more acts that would constitute violations of § 3-303, § 3-304, § 3-305, § 3-306, or § 3-307 of this subtitle over a period of 90 days or more, with a victim who is under the age of 14 years at any time during the course of conduct.

**Penalty**
(b)(1) A person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 30 years.
(2) A sentence imposed under this section may be separate from and consecutive to or concurrent with a sentence under § 3-602 of this title.

**Required number of acts**
(c) In determining whether the required number of acts occurred in violation of this section, the trier of fact:
(1) must determine only that the required number of acts occurred; and
(2) need not determine which acts constitute the required number of acts.

(Continued…)

17

(a) A person may not engage in a continuing course of conduct which includes three or more acts that would constitute violations of § 3-303, § 3-304, § 3-305, § 3-306, or § 3-307[9] of this subtitle over a period of 90 days or more, with a victim who is under the age of 14 years at any time during the course of conduct.

A benefit accruing to the State of charging a defendant under Crim. Law § 3-315 is that the prosecutor is not required to prove specifically the occurrence of each act included under subsection (a). Crim. Law § 3-315(c) provides that the trier of fact: "(1) must determine only that the required number of acts occurred; and (2) need not determine which acts constitute the required number of acts." This provision appears to be in response to the issues surrounding jury verdict unanimity when specific acts are charged. Under Crim. Law § 3-315, the trier of fact need only find that at least three acts of the kind included in subsection (a) occurred over a span of 90 days or more with a victim who was under the age of 14 at some point during the charged timeframe. Thus, when

---

(…continued)

**Merger of offenses**
(d)(1) A person may not be charged with a violation of § 3-303, § 3-304, § 3-305, § 3-306, or § 3-307 of this subtitle involving the same victim in the same proceeding as a violation of this section unless the other violation charged occurred outside the time period charged under this section.
(2) A person may not be charged with a violation of § 3-303, § 3-304, § 3-305, § 3-306, or § 3-307 of this subtitle involving the same victim unless the violation charged occurred outside the time period charged under this section.

[9] The specific crimes associated with each of these sections are first degree rape (Crim. Law § 3-303); second degree rape (Crim. Law § 3-304); first degree sexual offense (Crim. Law § 3-305); second degree sexual offense (Crim. Law § 3-306); and third degree sexual offense (Crim. Law § 3-307).

charging a defendant under Crim. Law § 3-315, the State may attain only one conviction for a continuing course of conduct per victim.

Here, Bey's sentence was based, in part, on convictions of ten counts of continuing course under Crim. Law § 3-315. The State charged him with ten separate charges of a continuing course of conduct with a child. Nine of the charges were divided into individual years and by the discrete types of sexual act misconduct alleged to have occurred in each year.[10] By electing to charge Bey under Crim. Law § 3-315, the State could only obtain at most a single conviction of one continuing course of conduct with a singular victim, and thus, Bey may be sentenced for only one conviction of a continuing course nature.[11] Therefore, we vacate Bey's multiple sentences under Crim. Law

---

[10] The charges under Crim. Law § 3-315, as depicted in his indictment, included specifically:

Count 2: May 3, 2010 – December 20, 2010 (second degree rape, second and third degree sexual offense)
Count 4: December 21, 2010 – December 20, 2011 (second degree rape)
Count 5: December 21, 2010 – December 20, 2011 (fellatio)
Count 6: December 21, 2010 – December 20, 2011 (cunnilingus)
Count 8: December 21, 2011 – December 20, 2012 (second degree rape)
Count 9: December 21, 2011 – December 20, 2012 (fellatio)
Count 10: December 21, 2011 – December 20, 2012 (cunnilingus)
Count 12: December 21, 2012 – December 20, 2013 (second degree rape)
Count 13: December 21, 2012 – December 20, 2013 (fellatio)
Count 14: December 21, 2012 – December 20, 2013 (cunnilingus)

[11] Charging a defendant under Crim. Law § 3-315 is a choice that the prosecution elects to make; it is not a requirement under Maryland law. The State could choose to charge each individual sexual act and be burdened with the responsibility of proving specifically every occurrence of each sexual act alleged during the time frame. This statute provides relief to the prosecution from this challenging burden, made difficult

(Continued…)

19

§ 3-315, and remand to the circuit court for a new sentencing in accordance with this opinion.[12]

**2.**

Alternatively, if the foregoing reasoning were deemed unpersuasive, we would reach the same conclusion nonetheless, albeit by a different route. As the Court of Appeals stated, "when we are faced with multiple punishments deriving from a single statutory provision," we should "analyze the unit of prosecution." *Triggs v. State*, 382 Md. 27, 43, 852 A.2d 114, 124 (2004). Furthermore, the unit of prosecution is "'ordinarily determined by reference to legislative intent.'" *Id*. (quoting *Purnell v. State*, 375 Md. 678, 692, 827 A.2d 68, 76 (2003)).

The State argues that the Legislature intended for prosecutors to determine the unit of prosecution, so long as the course of conduct exceeded the 90-day minimum. According to the State's theory, the Legislature intended that so long as the State can prove three illegal acts within a period of 90 or more days (and the victim is under the age of 14 for some of the period), that constitutes a course of conduct and a unit of prosecution. Theoretically then, assuming the victim's memory was sufficient, the State

---

(…continued)

inherently with younger victims who struggle with articulating exactly what sexual act occurred and with remembering the exact details and dates of each incident.

[12] At this hearing, because no issues with Bey's other convictions (for five counts of sexual abuse of a minor and two counts of third degree sexual offense) were raised before this Court, those convictions and one conviction for a continuing course of conduct under Crim. Law § 3-315 may be considered in fashioning a new sentence for Bey.

20

could have proven four units of prosecution per year for as long as the conduct continued, or until the victim turned 14 years old.[13]

Even if the State's reasoning could be deemed plausible and persuasive,[14] the result we would reach would not change. At best, that reasoning highlights that the Legislature's intent with regard to the unit of prosecution is capable of at least two contradictory interpretations and the statute is therefore ambiguous: "'[A]mbiguous units of prosecution . . . , pursuant to the rule of lenity, must normally be construed in favor of the defendant,' effectively merging the offenses." *Triggs*, 382 Md. at 43, 852 A.2d at 124 (quoting *Melton v. State*, 379 Md. 471, 488, 842 A.2d 743, 753 (2004)). As such, the

---

[13] The State argues also that each type of prohibited sexual activity may constitute a separate course of conduct. Thus, Bey was convicted of courses of conduct related to each rape, cunnilingus, and fellatio, even during overlapping time periods. The State supports this argument by reference to the disjunctive "or," rather than the conjunctive "and," in Crim. Law § 3-315(a). We do not think this argument floats the State's boat grammatically. Moreover, we find it implausible that the Legislature intended to treat the separate types of illegal sex acts as separate units of prosecution. Bey's convictions of course of conduct for each act must merge for sentencing purposes.

[14] Either because (1) one might read Crim. Law § 3-315(d)(1) as not requiring a prosecutor to charge all events as one course of conduct, but as allowing a continuation to charge and prove individual acts as separate crimes, so long as the acts fall outside a period charged; (2) one might attribute significance to the Legislature's apparent declination to include in Crim. Law § 3-315 an express limitation on charging more than one count of continuing course of conduct, despite its consideration during the relevant legislative session of model legislation from California and Arizona that contained such a prohibition (*see* Lynn McLain, *Reforming the Criminal Law: University of Baltimore School of Law Group Goes to Annapolis*, 34 U. Balt. L. F. 2, 9 & n.99-100 (2003)); (3) one might question the Legislature's purpose in establishing the 90-day minimum if the entire period of a defendant's conduct determines the course of conduct context; and/or (4) one were to conclude that it is more likely than not that the Legislature intended for prosecutors to determine the unit of prosecution, so long as the time period exceeded the statutory minimum.

21

sentences must be merged pursuant to the rule of lenity, even though neither party argued ambiguity here, apparently because of the certitude each possessed in their respective arguments regarding dueling "reasonable" constructions of the statute.

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AFFIRMED IN PART AND VACATED IN PART. CASE REMANDED TO THE CIRCUIT COURT FOR A NEW SENTENCING PROCEEDING CONSISTENT WITH THIS OPINION. COSTS TO BE SPLIT EVENLY BETWEEN BEY AND FREDERICK COUNTY.**

22

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 413

September Term, 2015

_____

DOUGLAS FORD BEY II

v.

STATE OF MARYLAND

_____

Graeff,
Friedman,
Harrell, Glenn T., Jr.
    (Retired, Specially Assigned),

JJ.

_____

Concurring Opinion by Friedman, J.

_____

Filed: June  29, 2016

I concur. I join Sections I and II of the Court's Opinion without reservation. With respect to Section III, however, I conclude that Section III(b)(1) is but one possible interpretation of Criminal Law § 3-315, while n.14 argues for another (to me, more plausible) interpretation. Thus, I am persuaded that the statute is ambiguous and, therefore, subject to the rule of lenity. As such, I would rely exclusively on the reasoning stated in Section III(b)(2).